ON RETURN TO REMAND
The appellant, Willy Edward Zumbado, was convicted after a jury trial of criminal possession of a forged instrument in the second degree (CC-88-288-A), In violation of § 1SA-9-6, and of conspiracy to commit murder (CC-89-001), in violation of § 13A-4-8, Code of Alabama 1975, He was sentenced to 10 years' imprisonment on the conviction for possession of a forged instrument and to life in prison on the conviction for conspiracy to commit murder. He raises 10 issues on appeal.
At trial, the state's evidence tended to how the following facts. The appellant using the name "Guy Casey," and John William Aderhold became acquainted around 1082. At that time, Aderhold owned a small general store and some other properties in Munford, Alabama, in Talladega' County, In 1998; the appellant and Aderhold discussed, the possibility of the appellant's purchasing all of Aderhold's property: At the time, however, Aderhold was involved in a divorce arid the property could not be sold. Apparently, no other discussions regarding a possible sale took place until 1985, when Aderhold agreed to sell all his assets to the appellant.
In 1965, the appellant had a large hole dug at the end of the mobile home that he rented from Aderhold. He told Doris Faye Johnson, his girlfriend, that he intended to kill Aderhold and put him in the hole.[1] She told him that the body would be discovered. The appellant then stated-that he would take Aderhold to Costa Rica end "get rid of him." He also told Johnson that he wanted Thelma Strickland, Aderhpld's girlfriend, to go on the Costa Rica trip because, he said, she was "so dumb she wouldn't know anything or suspect anything." The appellant wanted Johnson to keep Strickland occupied on the trip.
In November 1986, the appellant, Aderhold, Strickland, Johnson, and Aderhold's sister, Julia Grace, went to Costa Rica for three weeks. The group flew from New Orleans to Tegucigalpa, Honduras, where they spent the night. Then they proceeded to San Joss, Coata Rica, where they stayed at The Grand Hotel. They spent time sightseeing. The appellant took them to a sugar plantation and showed them a sugar refinery, where he said that he wanted Aderhold to work. They also went to a farm owned by the Alpizars, friends of the appellant.[2] The appellant paid for all their trip-related expenses.
When the group returned to Alabama from Costa Rica, Aderhold told Julia Grace *Page 1227 
and his brother, Travis Aderhold, that he was selling all his real and personal property to the appellant and was planning to move to Costa Rica. He also told Travis that the appellant had arranged for him to work at a sugar refinery for a salary of $100,000 a year plus $50,000 for expenses and that he would put the money he made in a bank and earn a high rate of interest Travis last saw his brother the Sunday before he left for Costa Rica the second time.
On December 20, 1986, Aderhold and the appellant went to the office of William Lawrence, Aderhold's attorney to draw up papers to transfer Aderhold's real property to the appellant The bills of sale reflect a transfer from Aderhold to ABB, Inc. The property transfer was consummated that day.
On December 21, 1988, the appellant, Aderhold, Johnson, and Strickland left the United States for Costa Rica. The next day, the appellant called Kirk Stevens, a friend of Aderhold, an employee at Aderhold's store, and a neighbor of Aderhold and told him to inform Aderhold's sister of Aderhold's impending marriage to Thelraa Strickland. The group again stayed at The Grand Hotel in San Jose. The appellant had Aderhold sign several blank pieces of hotel stationery, explaining to him that his signature was necessary to obtain visas. After traveling to the Punta Arenas area and to the Alpizar farm, the group returned to San Jose. Then the appellant and Aderhold returned to the Alpizar farm, from which they took a trip to a nearby river. When they returned to the farm, the appellant told Mr. Alpizar that he had found gold in the river. Johnson and Strickland then arrived at the farm and saw both the appellant and Aderhold.
The next day, the appellant and Aderhold returned to the river. The following day, the appellant walked to the Alpizar house alone. He looked tired and was carrying a backpack. He told everyone that Aderhold had gone back to the United States, but he did hot say how he had traveled. He told Strickland that Aderhold was taking care of some business for him and that she would see him in about 10 days. Then the appellant, Johnson, and Strickland went back to The Grand Hotel in San Jose.
The next day, the appellant, Johnson, and Strickland returned to the Alpizar farm. The appellant and Johnson went to the river while Strickland stayed at the farm, The appellant carried a backpack, a pick, art as, some plastic garbage bags, and a long iron bar. Near the river, the appellant gave Johnson a 367 magnum pistol and told her to fire a warning shot if anyone came. While she stood guard, she heard a "chopping" sound end turned to see the appellant chopping a human leg into two pieces. She turned back around and was nauseated.
The following day, the appellant and Johnson returned to the river to an area that Johnson described as a "cascade of rocks." The appellant attempted to carry a large plastic bag containing something heavy do the cascade but was unable. He eventually dug a hole and buried the bag and its contents. He was able to carry a smaller plastic bag up the cascade of rocks and he buried that bag and its contents. The next day, the appellant returned to the area and, after returning all the tools he had left there the day before, he returned to the Alpizar farm, the appellant, Johnson, and Strickland returned to The Grand Hotel in San Jose before their departure for the United States. Strickland kept asking the appellant about Aderhold's whereabouts.
As the appellant, Johnson, and Strickland were departing San Jose by plane, a stewardess arid the pilot asked where the fourth person in their party was. The appellant told the stewardess that Aderhold had diarrhea and that he would join them later. The appellant subsequently put something in an empty seat on the plane, apparently to indicate that Aderhold was sitting there. Aderhold did not get on the plane, and Johnson testified that she had not seen him since he went to the river with the appellant.
The party flew from San JOSE to Tegucigalpa, Honduras. In Honduras, the appellant *Page 1228 
indicated that he did not want the customs officials to notice that they had four passports and only three people in their party. They spent the night in Honduras. The appellant changed their flights so that they would go through Mexico City, Mexico. At the airport in Honduras, Strickland asked the appellant where Aderhold was. He replied, "Didn't you see William on the plane?" However, when she turned to look, she saw only another plane taking, off. The appellant kept all their passports. because he said, it would be easier for him to communicate with the officials because he knew the language.
The appellant proposed, marriage to Strickland on Aderhold's behalf while the, group was in Mexico City, While there, the appellant had Strickland sign some blank stationery, again under the guise of obtaining visas., At his direction, some pieces were signed "Thelms Strickland" and some were signed "Thelma Aderhoid," He told Johnson that he wanted to take Strickland back to Costs, Rica and "get rid of her." The appellant wanted Strickland to take care of all Aderhold's business and told Johnson that Strickland would be the "last loose end." Johnson destroyed the stationery that Strickland had signed. The group flew from Mexico City to Houston, then, to New Orleans, and eventually returned to Munford.
Two to three days after they returned to Munford, the appellant borrowed a typewriter from Kirk Stevens. He typed letters to Julia Grace, William Lawrence, Thelma Strickland, and Kirk Stevens on the blank stationery that the appellant had had Aderhoid sign. Johnson proofread some of the letters for the appellant, The letters purportedly from Aderhoid, were on The Grand Hotel stationery. The envelopes were stamped with Honduran stamps that had not been postmarked. The appellant placed the letters in a large brown envelope. He gave the envelope to Strickland and asked her to deliver them. The letters to Grace and Strickland were typed on the typewriter that Stevens had loaned the appellant, but the letters to Lawrence and Stevens had not been typed on that machine.
William Lawrence received a letter dated January 8, 1989, purportedly from Aderhold, that the appellant had written and typed. It requested that Lawrence draft a. power of attorney, enabling Strickland to conduct Aderhold's business and affairs. Lawrence drafted the document and gave it to Strickland. The appellant told her that he was going to take the document to Aderhoid in New York where Aderhoid was conducting some business. At the appellant's direction, Johnson traced Aderhold's signature onto the power of attorney and returned the document to Strickland. He and Strickland then took the document to Lawrence's office and told him that Aderhoid had signed it in their presence. Instead of notarizing the signature, Lawrence prepared a "witness page" for the document. Strickland and the appellant signed the page, as witnesses for Aderhoid hold's. signature.
Julia Grace received a letter dated January 8, 1986, purportedly from Aderhoid. It was brought to her by the appellant, Johnson, and Strickland. The letter stated that Aderhoid had married Strickland, and that she was now using the flame Thelma Aderhoid: — The letter also stated how much he liked the appellant and how happy he WBB to be retiring in Costa Rica. The letter was signed "John W. Aderhoid." According to Grace, he would have signed a letter to her with "William," rather than using his formal signature.
Strickland received a letter dated January 8, 1986, that was purportedly from Aderhoid. The letter discussed some family problems and stated how happy he was to be married to her. It also directed her to take care of all his financial matters and to clean out his store.
Stevens received a letter dated January 17, 1986, purportedly from Aderhoid. The letter accused Stevens of interfering in his "private life" and of making libelous statements about Strickland. The letter also instructed Stevens to move off of Aderhold's land.
Strickland often went to see the appellant, who, upon seeing her approach, would *Page 1229 
hang up the telephone and tell her that he had been talking to Aderhold. Strickland went to the courthouse and obtained driver's license in the name "Thelma Aderhold." In addition, Strickland and the appellant went to see Travis, Aderhold's brother, after returning from, Costa Rica. The appellant introduced Strickland as "Mrs. Aderhold" and told her what to say the appellant told them that Aderhold was in Detroit getting a Lincoln Continental automobile for Strickland as a wedding present.
Shortly thereafter, the appellant told Strickland that Aderhold was in Costa Rica fixing up a house for them. He also told her that Aderhold was trying to come back to Alabama, but that if he could not, she and the appellant would travel to see him in Costa Rica.
Kirk Stevens visited Aderhold's mobile home after the appellant, Johnson, and Strickland returned from their second trip to Costa Rica. The appellant, Johnson, and Strickland were present. The appellant told him that Aderhold was sick in the bedroom. Thereafter, Stevens watched the mobile home, but lights never came on at night, and there was so indication that Aderhold was there Sometime between January 8 and January 22, 1985, Stevens, who ran Aderhold's store, closed the store, and Johnson "cleaned out" the .merchandise.
The appellant was arrested on January 22, 1986, for an unrelated offense. A search of the appellant's car revealed the typewriter that Stevens had loaned the appellant. Authorities found Aderhold's army discharge card, his Social Security card, his driver's license, some blank stationery, and some photographs in the mobile home occupied by the appellant.
Aderhold had not been seen since he went to the river near the Alpizar farm in Costa, Rica with the appellant, although Strickland once thought that she saw him at Navarre Beach, Florida.
Passport records in Costa Rica show that Aderhold left Costa Rica. However, Honduran passport records show that Aderhold entered, but that he never left Honduras. On November 28, 1986, Aderhold's suitcase was found at the Alpizar farm. Efforts to find Aderhold's body near the river in Costa Rica were unsuccessful. Aderhold's Social Security payments were stopped at the request of Travis in September 1996. No request for reinstatement has been submitted.
Based upon these facts, the appellant was indicted, in one indictment, for criminal possession of a forged instrument in the second degree and for forgery in the second degree. He was subsequently indicted, by seperate indictment, for conspiracy to commit murder.
 I
On May 29, 1992, this court remanded this cause to the trial court in order to hold a hearing pursuant to Bataori v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 89 (1986), and Powers v.Ohio, 499 U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).See Zumbado v. State, 616 So.2d 1221 (Ala.Cr. App. 1992). A hearing was held, at which time the parties stipulated that a prima facie case of discrimination had been established, District' Attorney Robert Rumsey then provided his reasons for using 7 of his 15 strikes to strike 7 of the 11 black veniremembers.
Rumsey stated that he struck C.B., veniremember no. 7, because she had served on a grand jury three to four years before trial, and at that time, had appeared inattentive or easily bored. He further stated that because this forgery and conspiracy to commit murder case was expected to be long and complicated, he did not think, that she would be a good juror. He stated that he thought she would be a good juror in other cases and he did not strike her from other cases.
Rumsey stated that he struck S.B., veniremember no. 12, because her sister was engaged to G.G., who was tried for armed robbery by his office either the same week as or the week after the appellant's trial. On cross-examination, Rumsey admitted that he had never asked a specific question regarding that relationship. He *Page 1230 
also stated that S.B. had been interviewed as a possible allbi witness for G.G. He stated that he had been told, possibly by Investigator Dennis Surrett, that she was related to G.G.'s fiance. In his "best judgment," he had this information at the time of trial, but he could not say for certain.
Rumsey Btated that he struck N.C., veniremember no. 25, because be had prosecuted one of N.C.'S family members for murder. However, on cross-examination, he could not recall this family member, except to say; that he was the veniremember's brother or brother-in-law. RumBey stated that he thought this veniremember answered affirmatively when the panel was asked during voir dire if any of their veniremember's family members had been prosecuted for a criminal offense,
Rumsey stated that he struck S.C., veniremember no. 82, because he had been prosecuted for failing to pay child support in .1985 and because that case was still ongoing in 1969 (the year of the instant trial). He stated that this, veniremember had not responded that he had been prosecuted when the question was asked during voir dire. He further stated that a sheriff's deputy, Thad Snyder, had told him that he was in the National Guard with S.C., that S.C. was a poor worker and resented authority, and that "he would not want him on a jury to decide his fate if he were on trial." He also stated that he had been told, by whom he could not recall that S.C's brother or cousin had recently been prosecuted for a drug offense.
On cross-examination, Rumsey stated that he had records to support his claims that S.C. had been prosecuted for failure to pay child support. He further stated that it was his "best recollection" that he possessed that information at the time he struck the jury, although that information is not reflected in his notes or his strike sheet. In addition, he stated that Surrett thought that, in 1989, they prosecuted one of S.C.'s relatives for a drug sale, although he did not know which relative.
Rumsey stated that he struck W.M., veniremember no. 79, because Deputy Dallas Davenport had told him that W.M. would not be a good juror because she was in financial trouble and he had served civil papers on her. He explained that Davenport thought that W.M. might have a "chip on her shoulder" about the judicial system. He further stated that because the appellant had been sued civilly as a result of his alleged crimes she might be sympathetic to the appellant. On cross-examination, he stated that he did not ask her whether she had ever been a defendant in a civil case, because, his said, Davenport knew for a fact that she had. He had no documentary evidence of W.M.'s civil problems at the hearing.
Ramsey stated that he struck M.S., veniremember no. 107, because Investigator Frankie Wallis had told him that M.S. was a suspect in several burglaries, although he thought that M.S. had never been charged. Wallis also had told him that he "thought" that M.S. wad related to H.S., whom the district attorney's office had prosecuted, Assistant District Attorney Gary Conover had told Rumsey that he knew that his office had prosecuted one of M.S.'s family members; Clarence. Haynes had told him that He "thought," but "was not sure," that M.S. was related to man who had fought with a deputy during an arrest and had broken the deputy's jaw and that he also thought that M.S. had bad feelings toward law enforcement. Thad Snyder had told him at the time of trial that M.S. was "mentally off," but when questioned before this hearing, he told Rumsey that be had been mistaken and that he had been thinking of another person by the same name.
On cross-examination, Rumsey stated that M.S. "was a problem with police" and. that his family members, were also suspects' in burglaries. He explained that he never asked during voir dire whether M.S. was related to H.S., whom his office had prose cuted, because Frankie Wallis had told him that he "thought" the appellant was. He further stated that he had struck all persons suspected of committing crimes. He stated the reasoning for his strike as follows: "[M]y reasoning is just simply that Frankie says he is a `no.'" In addition, *Page 1231 
although Conover had told him that he knew that his office had prosecuted one of M.S.'s family members, Rumsey never asked a question regarding that relationship during voir dire. Runway "thought" that M.S. was related to someone who had broken a deputy's jaw.
Rumsey stated that ha struck S.W., veniremember no. 191, because he did not think that she would be a good juror because she worked at a financial lending institution. He explained that he believed that employees of such institutions often notarize signatures for people they do not know and that because this was a forgery case he did not think she would be a good juror. He further stated that he thought that she would be a good juror in other cases and that he left her on the jury in other cases. On cross-examination, he admitted that he did not know whether S.W. was a notary or whether the person who witnessed the signature in this case was a notary.
[1] The law applicable to this case was summarised inWalker v. State, 611 Sp.2d 1139, 1139 (Ala. Cr.App. 1992), as follows:
 "On remand, the state had the burden of articulating clear, specific, legitimate, race-neutral reasons for each strike that were related to the case to be tried. See Ex parte Branch, 526 So.2d 609, 628 (Ala. 1987). In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons . . . are true, the challenges violate the Equal Protection Clause as matter of law. . . . At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.' Hernandez v. New York, ___ U.S. ___, ___, 111 S.Ct. 1859, 1868 [114 L.Ed.2d 895] (1991). Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext.' [528 So.2d] at 624 (citations omitted).
 "`The trial judge cannot merely accept the specific reasons given by the prosecutor at face value, see
[People v.] Hall, 86 Cal.8d [161,] . . . 168, 672 P.2d [854,] . . . 858-59, 197 Cal.Rptr. [71,] . . . 76 [(1988)]; Sloppy [v. State], 503 So.2d [860,] . . . 856 [(Fla.Dist.Ct.App. 1987)]; the judge must consider whether the racially neutral explanations are contrived to avoid admitting acts of group discrimination. See Sloppy, supra. This evaluation by the trial judge is necessary because it is possible that an attorney, although not intentionally discriminating may try to find reasons other than race to challenge a black juror, when race may be bis primary factor in deciding to strike the juror.'
 "Id. [626 So.2d] at 624. See also Ex parte Thomas, 601 So.2d B6 (Ala. 1992) (reversing based on the trial court's accepting the state's reasons at face value). We may reverse the trial court's determination only if it is `clearly erroneous.' 526 So.2d at 625. See also Hernandez v. New York."
Furthermore, when more, than one reason was given for striking some veniremembers, we need only find one race neutral reason among those asserted to find that; the strike was race-neutral; we need not address any accompanying reasons that might be suspect. SeePowell v. State, 608 So.2d 411 (Ala.Cr.App. 1992); Dais v.State, 655 So.2d 809 (Ala.Cr.App. 1989).
[2] Rumsey stated that he struck C.B. because he thought that she was inattentive or easily bored. This reason has been held to be race neutral. See Kelley v. State,602 So.2d. 473 (Ala.Cr.App. 1992); Mitchell v. State,579 So. 2d 45 (Ala.Cr.App. 1991), cert. denied,596 So.2d 954 (Ala. 1992).
[3] Rumsey stated that one of the reasons that he struck S.B. was because she had been interviewed as a possible alibi witness for another criminal defendant This reason is sufficiently race neutral.Cf. Bass v. State, 585 So.2d 225 (Ala.Cr. App. 1991) (strikes based on veniremember's acquaintance with defense witness held race neutral). *Page 1232 
[4] Rumsey stated that one of the reasons that he struck N.C. was because he thought that N.C. had answered affirmatively when the panel was asked if any family members had been prosecuted for a criminal offense. This is a sufficiently race neutral reason.See, Harris v. City of Lipscomb,602 So.2d 602 (Ala.Cr.App. 1992); Stephen v. State,580 So.2d 11 (Ala.Cr. App. 1990), aff'd. 580 So.2d 26 (Ala.), cert. denied ___ U.S. ___, 112 S.Ct. 178, 116 L.Ed.2d 188 (1991).
[5] Rumsey stated that one of the reasons that he struck S.C, was that a deputy, who knew S.C. from National Guard, service, had told him that S.C. was a poor worker and resented authority and that "he would not want him on a jury to decide his fate if he were on trial." He also stated that he struck S.C. for failing to pay child support. These are sufficiently race-neutral reasons. Heard v.State, 584 So.2d 556 (Ala.Cr.App. 1901) (prosecution for child support payments held a race neutral reason).
[6] Rumaey stated that he struck W.M. because Deputy Dallas Davenport had told him that W.M. would not be a good juror because she had financial troubles and he also told him that he had served civil papers on her. He further explained that Davenport thought that she might have a "chip on her shoulder" regarding the judicial system. This is a sufficiently raceneutral reason.
[7] Rumsey stated that he struck M.S. because Investigator Frankie Wallis had told him that M.S. was a suspect in several burglaries. This is a sufficiently race-neutral reason. See Stephens,580 So.2d at 19 ("founded suspicion of criminal activity can constitute a sufficiently race-neutral reason for the exercise of a peremptory challenge"). We also note that this strike is distinguishable from one held not racially neutral inWilliams v. State, [Ms. 90-567* November 13, 1992],1992 WL 880620 (Ala.Cr.App. 1992), wherein this court held that the fact that a narcotics officer knew the veniremember through his "drug work" was an insufficiently race neutral reason. Knowing someone through "drug work," without further explanation, does not necessarily point to criminal activity, whereas being a suspect does. Thus, this reason is race neutral. See Stephens.
[8] Rumsey stated that be struck S.W. because he did not think that she would be a good juror because she worked at a financial lending institution. He explained that he believed, that employees of such institutions often notarize signatures for people, they do not know and that because this was forgery case he (lid not think that she would be a good juror. This reason was race, neutral and related to the facts of this case.
Based on the foregoing, we find that the trial court's ruling on the appellant's Batson motion was not clearly erroneous.
 II
[9] The appellant argues that the trial court abused its discretion by granting the state's motion to consolidate the separate offenses, which he contends are "totally unrelated." A.R.Crim.P. 13.3(c) provides that offenses may be consolidated for trial if those offenses, "could have been joined in a single' indictment, information, or complaint" "Two or more offenses may be joined in a indictment, information, or complaint, if they: (1) Are of the same or similar character; or (2) Are based on the same conduct or otherwise: connected in their commission; or (3) Are alleged to have, been part of a common: scheme or plan." AR.Cr.P. 18.3(a), Based on the foregoing facte, the separate offenses with which the appellant was charged were both "connected in their commission" and "part of a common scheme or plan." Furthermore, had the appellant been tried separately for each offense, evidence of each offense would have been admissible in the trial of the other offense; therefore, the trial court did not abuse its discretion by consolidating the offenses. See Ex parteHinton, 548 So.2d 562 (Ala.), cert. denied,493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 3158 (1989);Averette v. State, 469 So.2d 1871 (Ala.Cr.App. 1985). *Page 1233 
 III
[10] The appellant argues that the trial court erred by denying his motion to diaraise the indictment charging forgery and criminal possession of a forged instrument because, he says, his right to a speedy trial was violated. The criteria for determining whether one's right to a Speedy trial has been violated are set forth inBarker v. Wingo,407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors to be considered are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of this right; and (4) prejudice to the defendant.Id, at 580, 92 S.Ct. at 2192; Ex parte Carrell,585 So.2d 104 (Ala. 1990), cert. denied,498 U.S. 1040, 111 S.Ct, 712, 112 L.Ed.2d 701 (1991). Regarding the balancing of these factors, the Barker Court noted the following:
 "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right, of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant In sum, these factors have no tallemanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process roust be carried out with full, recognition that, the accused's interest in a speedy trial is specifically affirmed in the Constitution."
407 U.S. at 681, 92 S.Ct. at 2193.
The chronology relevant to this issue is as follows:
 April 24, 1986: An arrest warrant, charging the appellant with forgery in the second degree was issued.
 February 23, 1987: The appellant was served with arrest warrant for forgery while incarcerated in the Jefferson County jail for a 1982 rape charge.
 June 18, 1987: The appellant filed a pro se motion in Talladega Circuit Court to dismiss. the forgery charge for lack of a speedy trial.
 September 14, 1988: The Talladega County Grand Jury returned an Indictment charging the appellant with forgery and with criminal possession of a forged instrument.
 October 19, 1988: The appellant filed a pro se petition for a writ of habeas corpus in St. Clair County where he was incarcerated at this point and asserted his right to a speedy trial. He simultaneously filed a "Plea to Jurisdiction" in the Talladega Circuit Court in which he requested that that court take no action until the St. Clair Circuit Court ruled on his habeas corpus petition.
 December 2, 1988: The Talladega County Grand Jury returned an indictment charging the appellant with conspiracy to commit murder.
 December 12, 1988: The appellant filed a pro se "Motion for Stay or Injunction Pending Appeal" as a result of the St. Clair Circuit Court's denial of his habeas petition. The appellant gave his notice of appeal and appealed to this court,
 April 10, 1989: While his appeal was pending in this court, the appellant filed a pro se motion for final, disposition of the forgery charges.[3]
 May 12, 1989: This court affirmed the St. Clair Circuit Court's denial of the habeas petition. See Zumbado v. State, 660 So. 2d 1096 (Ala.Cr. App. 1989). August 81, 1989: The appellant moved, through counsel, to dismiss for lack of a speedy trial.
 September 1, 1989: The trial court denied the appellant's motion to dismiss for lack of a speedy trial.
 September 13, 1989: The Talladega County Grand Jury issued an amended Indictment, again charging the appellant with forgery and with criminal possession of a forged instrument.
 September 18, 1089: The appellant's trial began. *Page 1234 
"The right to a speedy trial is triggered when a criminal prosecution has begun." Ex parte Carrell, 565 So.2d at 107. The appellant and the state both incorrectly argue that the prosecution began when the appellant was served with the arrest warrant in 1987. This court, however; has held that the issuance of an arrest warrant triggers a defendant's right to a speedy trial, Steeley v, City ofGadsden, 588 So.2d 671 (Ala.Cr.App.-1968), overruling,Watson v. State, 389 So.2d 961 (Ala. Cr.App. 1980); seealso § 15-3-7, Code of Alabama. 1975; therefore, the appellant's right to a speedy trial on the charges of forgery and of criminal possession of a forged instrument was triggered on April 24, 1986.
[11] Unless the length of time between the commencement of the prosecution and the trial is presumptively prejudicial, it is unnecessary to consider the other Barker factors,Barker, 407 U.S. at 530, 82 S.Ct. at 2192, In this case, the length of time between the issuance of the arrest, warrant and the trial was. roughly 41 months, a delay that we consider to be presumptively prejudicial. Cf. Ex parte Correll,565 So.2d at 107-08 (35-month delay held to be presumptively prejudicial),
Thus, we must now examine the reasons for the delay, the appellant's assertion of his right, and the prejudice to the appellant. We examine the reasons for the delay and the assertion of his right together as they fall within the chronology. The appellant was not served with the arrest warrant for forgery until February 23, 1987, approximately 10 months after it was issued. The record does not reflect that he had any knowledge of the warrant, prior to service, The appellant first asserted his right to a speedy trial on June 16, 1987, but in that motion, he did not demand that he be brought to trial.[4] The appellant did not again assert this right to a speedy trial during the 16-month period from June 1987 until October 1988.
The appellant wee indicted on September 14, 1988. In October 1988, the appellant filed a petition for a writ of habeas corpus in St. Clair County, asserting his right to speedy trial and simultaneously requesting that all proceedings in Talladega County be stayed. Upon the denial of his petition in December 1988, be filed a motion to stay the proceedings in St. Glair County pending appeal of that ruling. On April 10, 1989, while his appeal was pending, the appellant, filed a motion for final disposition of his forgery, charges., The appellant waited from April 1989 until August 1989 to assert his right again, and his trial began on September 18, 1989.
The record reflects no evidence of any; intentional delay on the part of the state in order to gain a tactical advantage. "Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker." McCallum v.State, 407: So.2d 866, 868 (Ala.Cr.App. 1981) (quotingWalker v. State, 888 So.2d 762 (Ala.Cr.App.), cert. denied,386 So.2d. 765 (Ala. 1980), rev'd in part; vacated in part, 860 P.2d 1091 (11th Cir. 1988)). We conclude that the vast majority of the delay was attributable to the appellant's filing various motions and. the failure to actively pursue his right to a gpeedy trial.
[12] We find it extremely important that the appellant has failed to show how he wae prejudiced by the delay; Barker set out three interests that the right to speedy trial was intended to protect add by which the level of prejudice is to be messured: (1) "to prevent oppressive pretrial incarceration"; (2) "to minimize anxiety; and concern of the accused"; and (8) "to limit the possibility that the defense will be impaired," Barter, 407 U.S. at 582, 92 S.Ct. at 2198. The appellant was incarcerated for. a 1982 rape charge at the time the arrest warrant was issued and at the time he was served with the warrant The appellant contends that a detainer filed as a result of the instant charges kept him from being paroled after his conviction on the *Page 1235 
rape charge. The details of that conviction and his resulting sentence were not made part of the record; therefore, we are unable to adequately determine the effect of the detainer on his incarceration. The appellant failed to argue that the delay in setting a trial date caused him inordinate anxiety or concern. Moreover, he did not show that the delay in bringing him to trial impaired his defense.
Considering all the Barker factors, especially the delay attributable to the appellant, we conclude that the appellant's right to a speedy trial was not violated and that, therefore, the trial court did not err by denying the appellant's motion to dismiss.
 IV
[13] The appellant argues that the trial court erred by denying his motion requesting funds to fly members of the Alpizar family from Costa Rica to testify on his behalf. Initially, we note that no Alabama case law requires the state to pay the expenses of nonexpert defense witnesses. See Adkins v. State,600 So.2d 1094 (Ala. Cr.App. 1990), remanded on other grounds,800 So.2d 1067 (Ala.), after remand, 600 3o.2d 1072 (Ala.Cr.App. 1992).
A hearing was held on the appellant's motion. The appellant took the stand to make an offer of proof. He testified as follows: Evaristo Alpizar's testimony would contradict that of Doris Johnson.[5] Eylin Alpizar would testify, contrary to Johnson's statements, that she had spent time with Thelma Strickland and Johnson in San Jose "on a critical day relating to John W. Aderhold and our whereabouts and [his] alleged disappearance. Rafel Alpizar would testify regarding Strickland's behavior and hie testimony as to pertinent date's would contradict that of Johnson. Rafel would also testify that Strickland had had sex with him. Don Guillermo Alpizar would testify "to the truth of what took place." When asked for specifics, the appellant only stated that the information was, "reserved," but did state that it would contradict statements given by Johnson. Don Guillerino Alpizar would also testify regarding who had been on a one-day cruise on December 22, 1985. Victor Hugo Alpizar, Edwardo Alpizar, and Evaristo Alpisar would all testify that they had been concerned for the appellant's and the victim's safety. They would also testify that they had gone down to the river after they had heard gunshots and that the appellant stated that be had shot a "mantagorde," a small jungle cat.
The state withdrew its objection, and the prosecutor stated that the state would pay to fly the Alpizar s to the United States. The prosecutor asked the appellant if he could get: the Alpizars to come, because he had asked them, and they had apparently refused. The prosecutor also named one of the Alpizars that he wanted to come, but who, he contended, the appellant had told not to come. The motion was later denied by the trial court.
Because the state is not required to pay the expenses of nonexpert witnesses and because the. offer of proof was limited to only very general evidence, the trial court did not err by denying the motion requesting funds.
 V
[14] The appellant argues that the trial court erred by admitting allegedly inadmissible hearsay evidence. During direct examination of Travis Aderhold, the following occurred:
 "Q. [Prosecutor]: Did you have a conversation with William about selling the stuff to [the appellant], and about going to Costa Rica?
 "A. [Travis Aderhold]: Yes, he told me —
 "MR. MALONE [defense, counsel]:
 "Judge I'm objecting to what be might have said. That would be hearsay."
 "MR, RUMSEY [prosecutor]: It would be hearsay, Judge, but it would be admissible under the Fatal Journey Doctrine. This would be the Sunday before they left December the 20th.
 "THE COURT: All right. Overruled. *Page 1236 
 "MR. MALONE: Judge, 1 don't think that doctrine would apply in this situation, at this point in time, I don't think there has bees sufficient predicate.
 "MR. RUMSEY: Let me further qualify it this way.
 "Q. This conversation that you had with William, was or alone or was [the appellant] in the room?
 "A, No, we [were] alone.
 "Q. You were alone at this time?
 "A. We went to get the papers out of the box.
 "Q. Who all was present? Just you and your brother?
 "A. He and I.
 "MR, RUMSEY: Judge, we will say it would be — Under that case, the 1949 . . . case it would be evidence that it would fall under the Fatal Journey doctrin.
 "THE COURT: All right.
 "MR. MALONE: Judge, We are going to object again at this time.' I don't, think it's proper at this time.
 "THE COURT: Overruled.
 "Q. Now, if you would, tell us what William told you that Sunday before he went to sell his property that next week and to go to Costa Rica?
 "A. He just, told me that they were going, to sell it. As. soon as they' got it closed out, they were going to Costa Rica. And he would be paid is Costa Rica and put the money in a bank at a high, rate of interest.
 "THE COURT: I'm going to exclude that.
 "MR. WILLINGHAM, [another defense counsel]: Judge, we move for a mistrial at this time.
 "THE COURT: Overruled. Where he said he was going, I'm admitting, but the other part I'm excluding.
 "MR. RUMSEY: Judge, would you also be excluding what he said [he was] going to do once he went down there?
 "THE COURT: Right.
 ". . . .
 "THE COURT; We'll take up where we left off yesterday, and I think I'll let the court reporter read back the statement that' the witness made, a portion of which I excluded. And 1 might change my ruling on it. I studied Thornton and the other cases. Can you read back what that witness said?"
The trial court then overruled the appellant's objection. Shortly thereafter, the following occurred:
 "Q. [Prosecutor]: What did William tell you?
 "A. He told me he needed the papers —
 "MR. WILLINGHAM: Judge, we again renew our objection as far as —
 "THE COURT: All right. Overruled.
 "Q. You may answer.
 "A. He said he needed the papers for Lawyer Lawrence to finish cut the transaction on the business. He was selling if to [the appellant]."
The state's theory, was that the discussion of the trip by Aderhold with his brother Travis was admissible to show that he was preparing to leave for Costa Rica with the appellant. The Alabama Supreme, Court has addressed a similar issue:
 "`Evidence of the statements of a person since deceased with reference to the purpose or destination, of a trip or journey, no matter how short, that he was about to make, has been admitted as competent in a considerable, number of actions, both civil and criminal in character. See the following cases: (citing Mutual [Life]Ins. Co. v. Hillnon, 145 U.S. 285 [12 S.Ct. 909, 86 L.Ed. 706 (1892)]. . . ., and decisions from other federal courts together with cases from Alabama. and many other states).'
 "The rule was stated in Alabama by this court as early as 1844, speaking through Collier, C.J.: `It was said in West v. Price's Heirs, 2 JJ. Marsh [Ky.], 880, that "conversations or declarations. made by the actor or party concerned, at the time an act is done, and which explain the quo animo and design of the performance, may, whenever the nature of the act is called in question, be given Id. evidence as part of the res geatas. Without tolerating this explanation of *Page 1237 
the acta of men, by receiving their accompanying declarations, we should be often misled as to their true nature and character, and consequently liable to fall into errors in respect to them. The rule requiring res gestae declarations to be received into evidence is a necessary and very useful one.' (Citing' authorities.)
 "`In the case before us, the thing done was the departure of the plaintiff from his home; what he said upon leaving, or immediately previous thereto, as to the point of his destination, the object be had in view and when he expected to return, were explanatory of his intention; and in the absence of opposing proof, might repel the imputation that he was absconding or otherwise endeavoring to evade the `service of ordinary process. These declarations, it is true, would not be conclusive upon the defendant; but it would be competent for him to prove that they were not juat exponents of the res gestae.
Other evidence would be admissible to show that his acts end intentions were different from what his statements indicated. .: The testimony on this point, it will follow; was improperly rejected.' Pitta v, Burroughs, 6 Ala 788 [1844].
 This rule of evidence has been repeatedly reaffirmed by our courts. Kilgore v. Stanley, 90 Ala. 628, 8 So. 180 [1890]; Martin v. State, 77 Ala. 1 [1884]; Harris v. State, 96
Ala. 24, 11 So. 286 [1892]; Burton v. State, 116 Ala. 1, 22 So. 686 [1897]; Central of Georgia R. Co. v. Bell, 187. Ala. 641, 65 So. 896 [1914]; Boberaon v. State, 218 Ala. 442, 118 So. 654 [1928]; Rogers v. State, 16 All.App, 58, 76 So. 284 [1917]; Hall v. State, 26 Ala.App. 344, 169 So. 500 [1936].
 "The res gestae alluded to here is not the res gestae of the main fact — the murder but the res gestae of the act being performed, or immediately contemplated by the declarant the act of beginning or contemplating the trip or journey. Maddox v. State, 159 Ala. 53, 48 So. 889 [1909]; Mayo v. State, 15 Ala.[App.] 804, 78 So. 141 [19161 Hardaman v. State, 17 Ala.App. 49, 50, 81 So. 449-[1919]." Thornton v. State, 268 Ala. 444, 448, 45 So.2d 298, 801 (1950). See Hayes v. State, 896 So.2d 127, 148-44 (Ala.Cr.App. 1980). cert denied, 896 So .2d 160 (Ala. 1981) (quoting Thornton); see also Cook v. Latimer, 279 Ala. 294, 184 So.2d .807 (1966).
The appellant argues that Thornton andHayes are distinguishable because the victim in those cases was murdered. The appellant should not have the benefit of having this clearly relevant evidence excluded merely because the victim's body could not be found and the appellant could only be tried in Alabama for conspiracy to commit murder, as opposed to murder. Even, though the victim is unavailable in this case, the same rationale should apply.
The appellant also contends that Travis's statements are too remote to be relevant. We reject that contention.
[15] Furthermore, even if the trial court erred by allowing this evidence, any error was harmless. A.R.App.P. 45. provides as follows:
 "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of . . . the improper admission or rejection of evidence, . . . unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Travis merely provided evidence cumulative to that of other witnesses. Julia Grace and William Lawrence testified that the victim had told them that he was Belling his property to the appellant and moving to Costa Rica. The only evidence provided through Travis and not provided through other witnesses was the fact that the victim was to be paid in Costa Rica, the amount of his purported salary and expenses, and his intention to put his money in a Costa Rican bank at a high rate of interest. The admission of these additional facts simply did not affect a substantial right of the appellant. *Page 1238 
 VI
[16] The appellant argues that the trial court erred by ruling that a common-law marriage did not exist between Doris Johnaon and the appellant, thus preventing her from invoking the spousal privilege. A hearing was held outside the jury's presence regarding this issue. During that hearing. Johnson testified that the appellant was not her husband; that her; name on her passport, appeared as "Doris Faye Johnson" and that she had testified in another case that they were not married. However, she also testified that she had told investigators on April 2, 1986, that she and the appellant had lived as husband and wife for five years; that, on April 9, 1986, she told investigators that she and the appellant had been common-law husband and wife; that, oh April 17, 1986, she testified that she and the appellant were husband and wife in December 1985 and January 1986; and that she had lived with the appellant since 1960. She further, stated `that the appellant sometimes introduced her as his wife and that while the" appellant was in jail, he told Johnson that they were married and that she could hot testify against him and specifically told her to flay that they were married in December 1986. Finally, she testified that although she did not hold herself out as the appellant's wife, she did tell an attorney in Birmingham that she and the appellant were married because the appellant had told her to.
The trial court denied the appellant's motion, stating that the appellant had failed to prove that the appellant and Johnson were husband and wife and that, even if they were, Johnson could waive the privilege. We agree. The appellant failed to prove that he and Johnaon were common-law husband and wife.
 VII
The appellant argues that the trial court erred by denying the appellant's motion to suppress the evidence recovered pursuant to a search warrant authorizing a search for and seizure of cocaine and marijuana. The facts relevant to the search issue are as follows: On January 21, 1986, Emmet Doggrell, a narcotics officer with the City of Anniaton Police Department, appeared before Circuit Judge Jerry Fielding to obtain a search warrant for Aderhold's former residence, where the appellant was then living, to search for cocaine and marijuana. Doggrell obtained the warrant based on information provided by a confidential informant. Doggrell also testified that the informant bad informed him of the following; "He relayed to me that Mr. Aderhold was a resident of this county and bad a little country store, I believe, to the beet of my knowledge, and had been missing quite a while, and it was his information and his belief that the Defendant had killed him.
On that same date, Mike McBurnett, a deputy investigator with the Talladega County Sheriff's Department, received information regarding a "Phillipe Kent," who was wanted for a 1682 rape in Birmingham. In the early morning hours of January 22, McBurnett and other officers arrested the appellant, known as both Phillips Kent and Guy Casey, based on a picture and on the arrest warrant for the 1982 rape. The appellant was turned over to Birmingham police officers.
Prior to the search, McBurnett had received information of a complaint by Kirk Stevens that the letters purportedly from Aderhold in Costa Rica were not in the language frequently used by Aderhold and that Aderhold did not usually type letters. McBurnett was also aware that Aderhold had sold all of his property to the appellant. He also received information regarding a typewriter. McBurnett knew that Adtsrhold had gone on a trip with the appellant, arid that he had not returned. However, he had not been told about the information possessed by Doggrell that the appellant had allegedly killed Aderhold.
Later on January 22, 1986, authorities searched the appellant's residence for cocaine and marijuana. Inside the mobile home, officers found Aderhold's discharge card from the United States army, his Social Security card, his driver's license, blank stationery, and some photographs. Doris Johnson was present and consented *Page 1239 
to the search of the Oldsmobfle automobile parked near the mobile home. As officers opened the trunk, Kirk Stevens walked up and identified the typewriter; in the trunk as the one the appellant had borrowed from him. Officers seized Aderhold's army discharge card, his Social Security card, his driver's license, blank stationery, some photographs, and the typewriter.
 A.
[17] The appellant challenges the seizure of the Social Security card, the discharge card, and the driver's license, but he does not challenge the seizure of the photographs and blank stationery. He specifically argues the items to which he objects had no connection to the items described in the Warrant and that there was no probable cause to setae them because McBurnett, who had seized the items, had no knowledge that Aderhold was missing. The state contends that the discharge card, the Social Security card, and the driver's license found in the bedroom of the mobile home were in plain view. We agree. In Cowart v. State, 488 So.2d 497 (Ala.Cr. App. 1985), overruled on other grounds, McClendon v. State,613 So.2d 102 (Ala.Cr. App. 1986), this court held as follows:
 "Since the police officers had executed a valid `search warrant at appellant's home, there is no merit to Cowart's claim that the contraband was seised without probable cause. The search warrant directed the officers to search for dilaudid and marijuana,' and the officers seized marijuana, various marijuana paraphernalia, and 1601 tablets in two plastic bags in the refrigerator. The plain-view seizure of the items not listed in a search warrant it. Justified Where the officer's intrusion into the residence is pursuant to a valid search warrant and the item seized it of an incriminating nature. Coolidge v. New Hampshire, 403 U.S. 448, 91 S.Ct. 2022, 29 L.Ed.2d 664 (1671); Mitchum v. State, 884 So.2d 1193 (Ala.Cr.App.), cert. denied, 384 So.2d 1206 (Ala. 1980).
 "As for the seizure of the pistol during the search, if, during a lawful search, the police searching in the manner authorized find evidence of another offense not related to the crime for which the warrant woe issued, it may nevertheless be lawfully seized. Baty v. State, 401 So.2d 308 (Ala.CrApp. 1981); Sheppard v. State, 49 Ala.App. 674, 275 So.2d 858 (1973)."
488 So.2d at 508 (emphasis added). See Milchum v. State,384 So.2d 1198 (Ala.Cr. App.), cert, denied,884 So.2d 1205 (Ala. 1980); Yielding v. State, 371 So.2d .951 (Ala.Cr.App.), cert. denied, 871 So.2d 962 (Ala. 1979).
The discharge card, the Social Security card, and the driver's license were incriminating evidence. Doggrell had information that Aderhold was missing and that the appellant had killed him. McBurnett had information that Aderhold had gone on a trip with the appellant and had not returned and that Aderhold had transferred all of his property to the appellant Either officer had probable cause for the seizure. Thus, the seizure of these items not named in the search warrant was not improper.
 B.
[18] The appellant also challenges the seizure of the typewriter on the same grounds asserted in challenging the seizure of Aderhold's, personal papers. The state contends that its seizure was proper because Doris Johnson had consented to the search of the car. The appellant did not challenge, Johnson's right to consent to the search of the automobile, but he asserted that the typewriter was not within the scope of the warrant.
Prior to the search of the car, Johnson was advised of her right not to consent to the' search of the car. Nevertheless, she consented.
In a similar circumstance, this court held as follows:
 "[Section] 334.01(3)(b) of McElroy's Alaboma Evidence states that the general rule is as follows:
 "`. . . . A defendant has no constitutionally protected right, of privacy where he does not have exclusive possession and control over the place searched. *Page 1240 
The person who does have present, exclusive possession and control over the place in question, or who sham the premises coequally with the person claiming to be aggrieved, may give consent to search.'
 "C. Gamble, McElroy's Alabama Evidence § 334.01(3)(b) (3rd ed. 1977); Sec also Myrick v. State, 46 Ala.App. 162, 227 So.2d 448, 450 (1969) (upheld a search consented to by defendant's father to whom defendant had given the keys to hie ear); and Sohneckloth v. Bustamonte, 412 U.S. 218, 98 S.Ct. 2041, 86 L.Ed.2d 854 (1973) (upheld consent given by occupant of car who indicated that the car belonged to his brother).
 "The evidence indicates that Mr. Adkins was in sole possession and control of the vehicle and that he voluntarily consented to the search: The appellant offered no evidence tending to show that Mr. Adkins did not have the authority to consent to the search. The evidence found as a result of the search was therefore properly admitted. See also Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2798, 111 L.Ed.2d 148 (1990) (reasonable belief of police officer that third party giving consent to search had common control over area searched makes search reasonable notwithstanding fact that third party did not, in fact, have such control)."
Johnson v. State, 584 So.2d 881, 686 (Ala. Cr.App.l991). The record reflects that Doris Johnson had lived with the appellant since 1980, that the appellant had been arrested that, day, and that Johnson was apparently in exclusive control of the premises, McBurnett's knowledge of the information that Kirk Stevens had previously supplied of the fact that Aderhold had not returned from a trip that he had taken with the appellant and of the fact that Stevens's identification of the typewriter as his at the time of the seizure gave McBurnett probable cause to seize the typewriter. Applying the Johnson rationale to the instant case, Doris Johnson validly consented to the search of the automobile, and the typewriter was properly seized.
The trial court properly overruled the appellant's objections to the admission of the discharge card, the Social Security card, the driver's license, and the typewriter into evidence.
 VIII
The appellant argues that his convictions for criminal possession of a forged instrument in the second degree and for conspiracy to commit murder are "against the law and evidence." Specifically he challenges both the sufficiency and the weight of the state's evidence.
 A.
Initially, we briefly discuss the differences, between these two issues because they are often argued interchangeably even though they are distinct and separate issues. In Johnson v. State,666 So.2d 818, 819-20, (Ala.Cr.App. .l989), this court noted the difference in "sufficiency" and "weight" as follows:
 "The weight of the evidence, is clearly a different matter: from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, `viewing the evidence in the light moat favorable to the prosecution, [a] rational factfinder could have found the defendant guilty beyond a reasonable doubt.' Tibbs v. Florida, 467 U.S. 31, 87, 102. S.Ct. 3211, 2215, 72 L.Ed.2d 662 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App. 1984).
 ". . . .
 "In contrast, the `[t]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."' Tibbs v. Florida, 457 U.S. at 37-88 [102 S.Ct at 2216] (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 969, 964 (Ala.Cr.App.), cert denied, 405 So.2d 966 (Ala. 1981); Crumpton v. State, 402 So.2d 1081, 1065 (Ala.Cr.App.), cert. denied, 402 So.21 1088 (Ala. 1961); Nobis v. State, *Page 1241 401 So.2d 191, 198 (Ala.Cr.App.), cert, denied, 401 So.2d 204 (Ala.l981). `"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."' Harris v. State, 618 So.2d 79, 61 (Ala.Cr.App. 1987) (quoting Byrd v. State, 24 Ala.App, 461, 136 So. 481 (1981)).
(Emphasis in original.) See Smith v. State,604 So.2d 434 (Ala.Cr.App.1692); Pearton v. State,601 So.2d 1119 (Ala.Cr.App. 1992); Curry v. State,601 So.2d 167 (Ala.Cr.App. 1992).
[19, 20] The issue of the sufficiency of the evidence is preserved for review by a defendant's motion for a judgment of acquittal that is entered at the end of the state's case, at the close of the evidence, see A.R.Cr.P. 20.2(a), or after the verdict is entered, see A.R.Cr.P. 20.3. The motion must'state the ground that the state failed to prove a prima facie case. See, e.g., Exparte Maxwell, 439 So.2d 715 (Ala.l988). A defendant may also challenge the sufficiency of the evidence when moving for a new trial under A.R.Cr.P. 24.1 or when moving for an arrest of judgment under A.R.Cr.P. 24.2. A.R.Cr.P. 20.8(c); seePearson, 601 So.2d at 1128-24; Prather v. City of Hoover,585 So.2d 267; 268 n. 1 (Ala.Cr.App. 1991).
The issue of the weight of the evidence is preserved by a motion for a new trial, Btating "that the verdict is contrary to' law or the weight of the evidence." See A.R.Cr.P. 24.1(c)(1).
 B.
[21] The appellant argues that the stated evidence was insufficient to sustain hie convictions for criminal possession of a forged instrument and conspiracy to commit under; At the close of the state's evidence, defense counsel moved for a judgment of acquittal as follows:
 "MR. WILLINGHAM: Judge, we move to exclude the state's evidence and move for judgment of acquittal, and I have specific grounds.
 "We will submit that the testimony of the co-defendant or codefendants have not cooperated.
 "And as to the forgery case, we would submit that the State has failed to prove that ease in that one of the signatures — witnessed signatures on the forgery was for the person whose benefit the document is for. And we would submit that would make the power of attorney void and that forgery could not occur on a void document.
 "MR. MALONE [another defence counsel]: Also, Your Honor, that they fail to establish essential element in the forgery offense; that meaning the signature was unauthorized.
 "No testimony was presented — direct testimony that the signature was unauthorized.
 "THE COURT; Overrule both motions. Any further motions at this time?"
The appellant wholly failed to preserve either sufficiency issue. First, the appellant failed to state any ground regarding the charge of conspiracy to commit murder; therefore, the sufficiency argument as to this charge is procedurally barred.See Curry v. State,601 So.2d 157, 169 (Ala.Cr. App. 1992) (specific ground of objection of motion for judgment of acquittal waives all grounds not specified). Second, defense counsel referred only to "the forgery ease" or "the forgery offense" singularly and did not specifically challenge the charge of criminal possession of a forged instrument; therefore, the sufficiency argument as to this charge is likewise procedurally barred. SeeCurry.
[22] Furthermore, both sufficiency arguments are without merit. First, based on the foregoing facts, the state proved a prima facie case of criminal possession of a forged instrument. "A person commits the crime of criminal possession, of a forged Instrument in the second degree if he poasesses or utters any forged Instrument of a kind specified in section 13A-9-3 with knowledge that it is. forged and with intent to defraud."[6]
Ala. Code § 13A-9-6 (1975). *Page 1242 
"To `utter' means to directly or indirectly offer, assert, declare or put forth a forged instrument as genuine." Section 18A-91(12), "Intent to defraud" means "[a] purpose to use deception, as defined in section 18A-8-l(l), or to injure another person's interest which has value, as defined in section 13A-8-1(14)."[7] § 18A-9-1(8) (emphasis added). "The requisite intent need not be proves by positive and direct evidence as it may be inferred by the jury from the evidence before it."Johnson v, State, 412 So.2d 822, 825 (Ala.Cr.App. 1961) (citingMcGee v. State, 20 Ak.App. 221, 101 So. 821 (1924)).
The state's evidence tended to prove that Doris Johnson, at the appellant's direction, traced Aderhold's signature onto the power of attorney and that the appellant and Strickland told Aderhold's attorney, William Lawrence, that Aderhold had signed it. The appellant and Strickland also signed a "witness page" attesting to the fact that Aderhold had signed the power of attorney. The appellant's intent was a question for the jury, The state's evidence established a prima facie case, of criminal possession of a forged instrument
[23] Second, the state's evidence also established a prima facie case of conspiracy to commit murder., "The elements of conspiracy are first, the specific intent that a crime be performed; second, an agreement with another person to engage in or cause that crime to be performed; and third, the commission' of an overt act by one of the conspirators in furtherance of the conspiracy." Greer v.State 663 So.2d 89, 40. (Ala. Cr.App. 1990), Furthermore, "[c]onspiracy is a distinct and separate substantive offense from the crime intended, and' does not require that the criminal "offense agreed to be actually completed." id. (quoting Calhoun v.State, 460 So.2d 26B, 272 (Ala.Cr.App. 1984)).
 "The existence of a `confederation or conspiracy need not be proved by positive testimony. It seldom can be. The trier of fact is to determine its existence and extent from all the evidence in the case and the conduct of the parties.' Smith v. Board of Commissioners of the Alabama State Bar, 284 Ala. 420, 428, 225 So.2d 829, 885 (1969).
 "`[S]uch unlawful community of purpose entered into as a conspiracy need not be. proven by positive testimony. It is rarely so to be shown. It must be determined by the triers; of fact from the testimony. . . ." that of the attendant circumstances applying and accompanying the doing of the act, and from . . the conduct of the defendant subsequent to the criminal act,'
 "Lash v. State, 244 Ala. 48, 58, 14 So.2d 229, 282 (1948). A conspiracy `may he shown by circumstantial proof, or inferred from the conduct of the participants in execution of the conspiracy.' Skumro v. State, 284 Ala. 4, 7, 170 So. 776, 779 (1986). `Conspiracy may be inferred from the conduct of the conspirators.' Cleveland v. State, 2u Ala. App-426, 428, 103 So. 707, 710 (1924), cert. denied, 212 Ala. 835, 103 So. 711 (1925)."
Greer, 568 So.2d at 40-41.
It can reasonably be, inferred from the evidence presented by the state that the appellant conspired with Johnson to lure the victim to Costa Rica so that the appellant could murder him, dispose of his body, and acquire his property. We And that there was sufficient evidence presented by *Page 1243 
the state to allow the jury to conclude beyond a reasonable doubt that the appellant was guilty of conspiracy to commit murder.
 C.
[24] The appellant also argues that the jury's verdicts were contrary to the weight of the evidence. However, he has failed to preserve these issues for review. First, in his motion for new trial, the appellant asserted, "The verdict of guilty of forgery 2nd. degree is contrary to law." This ground is inadequate because he was convicted of criminal possession of a forged instrument, not forgery in the second degree, and a specific objection waives all grounds not specified. See Curry. In addition, the ground "[t]he verdict . . . is contrary to Law" is not sufficient to preserve this issue for review because it fails to state in what way the verdict was contrary to law. See Trons v. State,866 So.2d 879 (Ala.Cr.App. 1979); (wherein this court, citingLittle v. Peevy 238 Ala! 106, 189 So. 720 (1989), held that the ground "the verdict is contrary to law" is an insufficient ground if the motion does not state how the verdict is contrary to law));Caldwell v. State, 46 Ala.App. 482, 243 So.2d 764
(Ala. Cr.App.197l).
The appellant also argued, In his motion for a new trial, that "[t]he verdict of conspiracy to commit murder was contrary to the law." For the reasons stated above, this issue is also procedurally barred. Tram, Caldwell.
 IX
In his motion for new trial, the appellant argues that he was denied effective assistance of counsel within the parameters ofStrickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 "In Strickland, the United States Supreme Court articulated the standard for judging the effectiveness of counsel within the framework of the Sixth Amendment of the United States Constitution. The Court provided the following two-part test to determine whether `counsel's assistance was so defective as to require reversal of a conviction or death sentence,' id. at 667 [104 S.Ct. at 2064]:
 "`First, the defendant must show that counsel's performance was deficient This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment Second, the defendant must show that the deficient performance prejudiced the defeose. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
 "Id. To show that counsel's performance was `deficient,' a defendant must show that counsel's assistance was unreasonable considering all the circumstances. Id, at, 688 [104 S.Ct. at 2065], Counsel's conduct is to be `viewed as of the time of. . . . [the] conduct.' Id., (Emphasis added.) To show that he was `prejudiced' by counsel's conduct, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' Id. at 694 [104 S.Ct. at 2069]. `A reasonable; probability is a probability sufficient to undermine confidence In the outcome.'. Id."
Watkins v. State, [Me. 90-989, Sept. 80, 1992],1992 WL 240968, 1 (Ala.Cr.App. 1992).
[25] The appellant cites numerous instances in which he argues that his trial counsel, Bill Willingham and James Malone, were ineffective, First, he contends that counsel were ineffective because they failed to object to the trial court's instructions to the jury regarding complicity and reasonable doubt, However, he failed to raise these issues in his motion for a new trial or during the hearing on that motion; therefore, these issues are procedurally barred for review. *Page 1244 
[26] Second, he contends that counsel was deficient because; He says, they should have interviewed "certain witnesses"; however, he failed to identify those witnesses. At the hearing on the motion for new trial, Willingham testified that he and Malone interviews numerous witnesses. Other potential witnesses were mentioned at the hearing; however, the appellant failed to show that the failure to interview those witnesses constituted deficient performance by trial counsel See Williams v. State, 480 So.2d 1265 (Ala.Cr.App. 1985) (appellant's "unverified assertions" of what witnesses would testify to held insufficient for ineffective assistance claim). Further more, even if the failure to call these witnesses made counsel's performance deficient, we cannot say that it was prejudicial to the defense.
[27] Third, the appellant contends that counsel failed to contact authorities in Costa Rica and Honduras in an attempt to locate Aderhold. Willingham testified that he did not contact immigration authorities in Costa Rica and Honduras because he already had the documents in his possession, which were introduced into evidence, that supported his defense at trial that Aderhold had left Costa Rica and had entered Honduras. Willingham conceded that he did not contact authorities in Honduras or San Salvador to determine whether Aderhold was living there. The appellant has not shown that counsel's performance was deficient in this respect. Willingham introduced documentary evidence concerning Aderhold's departure from, COSta Rica, and whether Aderhold was living in Honduras or San Salvador was not relevant in the conspiracy prosecution. Counsel's conduct in this regard was not deficient Fourth, the appellant contends that counsel failed to subpoena "certain witnesses." However, during the hearing on his motion for a new trial, he failed to show that counsel's performance in failing to subpoena any witnesses discussed during that bearing was deficient. SeeWilliams.
[28, 29] Finally, the appellant contends that counsel failed to call Reuben Smith as a witness. The appellant argues that courteel should have called Reuben Smith as a witness because he would have testified that he had seen Aderhold in Vidor, Texas, on January 16, 1986. This issue, however, is without merit for several reasons. First, Smith was serving a sentence of life imprisonment without parole and had had at least four felony convictions. Second, he had given inconsistent statements regarding his meeting in Texas with Aderhold. Counsel will not be held ineffective for failing to call witnesses of questionable credibility. See Hunt v. State,480 So.2d 61 (Ala.Cr. App. 1985). Third, even if he had met with Aderhold at that time, proof that Aderhold was alive would have had little bearing on either charge, because Aderhold's death was not an element of either charge.
Thus, counsel's failure to call Reuben Smith as a witness did not constitute deficient performance.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] At the time of trial, Doris Faye Johnson's name was Doris Faye Johnson Jones. Testimony revealed that she was known to most of the other witnesses as "Tonic" or "Tonic Casey."
[2] The record spells the name of the appellant's friends two different ways — "Alpizar" and "Alpewar." For the purposes of this opinion, we will use the spelling "Alpizar."
[3] The appellant moved for final disposition of the detainer pursuant to § 15-9-82, Code of Alabama 1975; however, be failed to comply with the requirements of § 15-9-83; therefore, bit motion had no legal effect and did not trigger the 90-day period within which he had to be tried in accordance with § 15-9-84.
[4] Contrary to the state's assertion, we conclude that this motion, filed in the Talladega Circuit Court, was filed in the proper court.
[5] Other than by their names, the parties are not identified in the record.
[6] Section 13A-9-3 provides, in pertinent part, as follows:
 "(a) A person commits the crime of forgery in the second degree if, with intent to defraud, he falsely makes, completes or alters a written Instrument which is or purports to be, or which is calculated to become or to represent if completed;
 ". . .
 "(2) A public record, or en instrument filed or required or authorized by law to be filed is a public office or with • public employee. . . ."
[7] Section 13A-8-1(1) a b provide in pertinent part, as follows:
 "(1) DECEPTION occurs when a person knowingly:
 "a. Creates or confirms, another's impression which is false and which the defendant does not believe to be true; or
 "b. Fails to correct a false impression which the defendant previously has created or confirmed. . . ."
Section 13A-8-1(14) provides In pertinent part that "value" is the "market value of the property at the time and place of the criminal act."