On April 20, 2001, Jimmy Paul Knox was convicted of first-degree robbery, a violation of § 13A-8-41(a)(1), Ala. Code 1975. The trial court sentenced him, as a habitual felony offender, to life in prison.See § 13A-5-9(c)(3), Ala. Code 1975. This appeal followed.
Approximately four months before trial, the trial court granted Knox's request for a mental evaluation to determine whether he was sane at the time of the crime and whether he was competent to stand trial. However, as discussed in more detail below, on the day of the mental evaluation, the sheriff's deputy who was assigned to transport Knox from jail to Taylor Hardin Secure Medical Facility (hereinafter "Taylor Hardin") was late in retrieving Knox. Knox arrived too late at Taylor Hardin, and the evaluation was not performed by the time Knox's trial began a month later. At the beginning of the trial, Knox moved for a continuance because he had been unable to secure a mental evaluation. After a short hearing, the trial court denied Knox's motion for a continuance. Knox appeals the denial of that motion.
In his brief on appeal, Knox's "Statement of the Issue" reads: "Did the trial court deny the Appellant's right to due process and commit
reversible error by denying the Defendant's pretrial mental examination as ordered by the original trial [j]udge when his sanity at the time of the offense was seriously in question?" (Appellant's brief, p. 6.) Although Knox couches his argument solely in terms of his *Page 128 
sanity at the time of the offense, in his "Argument" section he also argues that he should have been evaluated to determine his competency to stand trial. Because we reverse the trial court's judgment and remand this cause on the basis that the trial court erroneously denied Knox a continuance to allow him to be mentally evaluated to determine his sanity at the time of the crime, we pretermit any discussion of the trial competency issue.
On November 22, 2000, approximately six weeks after his arrest, Knox filed a "Motion for Private Psychiatric Examination and Testing." In his motion, he requested that he be examined and evaluated "to determine his sanity both at the time of the alleged offense . . . and to test his [IQ] and ability to aid his attorneys in his defense." (C. 17.) On December 14, 2000, the trial judge[1] ordered an outpatient evaluation of Knox's competency to stand trial and of his mental state at the time of the offense.
On March 9, 2001, the trial judge ordered Knox transported from the county jail to Taylor Hardin for the mental evaluation previously ordered in December 2000. (C. 36.) On March 15, 2001, Knox was transported by a deputy to Taylor Hardin. Because the deputy was late in transporting Knox to Taylor Hardin, Knox was not evaluated to determine his state of mind at the time of the offense. Instead, the doctor only had time to ask a few cursory questions to establish that Knox was not suicidal at that moment and that he, therefore, did not present a danger to himself.
The trial court held a hearing on April 10, 2001, to address Knox's request for a continuance in order that he may be mentally evaluated as previously ordered by the trial court. The following exchange occurred:
 "THE COURT: Mr. Knox, I don't have the file in front of me to know the exact time, but back a few weeks ago you were transported by officials to Taylor Hardin —
"MR. KNOX: Yes, ma'am.
 "THE COURT: — for an evaluation by some psychiatric officials there. And you understand that they were to do an evaluation to make a determination as to whether or not you were mentally competent to do two things: Number one is to assist your attorney in the defense of your case, that is, to be able to communicate and to talk with her and assist in the defense. You understand that? *Page 129 
"MR. KNOX: Yes, ma'am.
 "THE COURT: And second thing was to do an evaluation to determine what your mental state was, whether you understood what was going on at the time of the alleged crime.[2] You understand that?
"MR. KNOX: Yes, ma'am.
 "THE COURT: And it's my understanding in talking with those officials that they were late in getting you to the evaluation?
"MR. KNOX: Yes, ma'am.
 "THE COURT: However, I was also informed by Taylor Hardin that you had indicated you did not wish to have that evaluation. If you would, tell me what you told them?
 "MR. KNOX: Your Honor, I didn't really get a chance to tell them anything. I didn't think I needed to have an evaluation. I've been in prison for four months now and they said he understood, there was not need to come get me all — come all the way down there and I keep running back and forth[. N]othing was getting done.
 "THE COURT: Did you talk with the people at Taylor Hardin?
"MR. KNOX: No, ma'am.
 "THE COURT: You're saying you didn't talk to them at all?
 "MR. KNOX: I seen the guy, I guess it's one of the counselors, and he never even talked to me. They asked me my name and stuff.
"THE COURT: My question is: Did you talk with anyone?
"MR. KNOX: No, ma'am.
 "THE COURT: You're saying you did not have any words with anyone?
 "MR. KNOX: I just told them my name and stuff. As far as like conversation, I never had a chance to.
 "THE COURT: Okay. Now, are you saying that you did not make a statement to them that you did not want the evaluation?
"MR. KNOX: No, ma'am.
"THE COURT: Okay. And at this point [in] time —
 "[Defense counsel]: Your Honor, our problem is he's relatively normal at this point, but our problem is the state of mind at the time that the event occurred and that's what we especially needed the evaluation on. I don't know where the mix[-]up is. But at the time this occurred, he did not know what he was doing.
"THE COURT: Anything from the State?
 "[Prosecutor]: No, ma'am. That's certainly a matter of opinion to be determined later. But it's my concern he's in prison and if the case is continued to allow the defendant to have the psychiatric evaluation, then they turn around later and file a speedy trial motion arguing that his right to a speedy trial has been violated because of the delay at the time that it's taken to get to trial. I think that's an inconsistent position. The State is prepared to strike the jury and try this case Monday.
 "THE COURT: Are you waiving the argument on speedy trial?
 "[Defense counsel]: It is not this defendant's fault that these people got him there late and that the people who brought him there said he didn't need it and they didn't want to come back and forth.
"THE COURT: No, is that the answer to the question?
"[Defense counsel]: No, I can't waive it.[3] *Page 130 
 "THE COURT: Well — well, the order has already been granted to allow the evaluation. Have a seat. I will contact Taylor Hardin myself and we will —
 "[Prosecutor]: The only thing I ask them, then, is that rather than have the sheriff's department send him back to the — if they can expediently let him stay up here until —
"THE COURT: That's what I'm gonna check on.
"[Defense counsel]: I think that would be wonderful.
"(Recess taken.)
 "THE COURT: In the case of State of Alabama versus Jimmy Paul Knox — I don't have that case number.
". . . .
 "THE COURT: There had been a request for psychiatric evaluation that had been requested at some time previously. Mr. Knox has been incarcerated with the Alabama Department of Corrections. That evaluation — is that right?
"[Prosecutor]: Yes, he's in the State['s] custody.
 "THE COURT: State['s] custody. That evaluation had been ordered and Mr. Knox was transported from his facility where?
"[Clerk]: Bibb County.
 "THE COURT: Incarcerated at Bibb County and transported to that evaluation. The appointment was at 9:00 . . . and he arrived at 10:30 as I understand it according to Taylor Hardin, that he was approximately an hour-and-a-half late. [Defense counsel], what was the request based upon?
 "[Defense counsel]: Your Honor, the request was based upon the fact that this gentleman was suicidal and it was based upon the fact that he was insane at the time the incident happened. His biological father had just died, his brother had just committed suicide, his wife had just left him, he had taken an overdose just a few hours before then. You see here where he has attempted to commit suicide. He walked into this place with a toy gun where this man had been robbed before and had shot somebody before hoping to be killed. This is not a motivation for a robbery. It is an act of somebody who is not competent at the moment to me.
 "That's the reason we need the psychiatric evaluation to determine whether he knew what he was doing at the time, he understood what he was doing at that time, and there's ample evidence that he does not and did not.
 "[Prosecutor]: I would like to respond to that since we're getting into substance of the facts of the case. Number one, this is not Mr. Knox's first time before this Court. He's got three prior felony convictions. And I reviewed the files, there was no request for psychiatric evaluation the first time he was up here on burglaries and pled to three different felony charges.[4]
 "Secondly, defendant was afforded an opportunity to have the psychiatric evaluation of where [sic] he arrived late and indicated to the doctor that he didn't want any. So, to now go forward with it after the defendant himself said he didn't wish for that evaluation I think would just cause the case to be needlessly delayed. *Page 131 
 "Further, Your Honor, you heard about an hour ago his attorney say she's raising speedy trial issues in the case and yet it's her motion to ask the Court to enter a psychiatric evaluation which would cause the delay of the trial.[5] We're prepared to move forward with the case. And as to the sad story about the defendant's state of mind on that day, and let me just represent to the Court, by the defendant's own statement he didn't just choose this place. He had gone and passed the stolen check there the day before he committed the armed robbery and decided he needed to get that check back and went back and committed an armed robbery the next day with the specific purpose of getting the stolen check that he had stolen and passed back. And that's reflected in his own statement.
 "So, I think there was — there was conscience, which reflects conscious decision[-]making at the time of the alleged offense.
 "THE COURT: Okay. Also for the record, I have been in communication with the attorney and with Mr. Knox and representative of the State standing here at the time I contacted Taylor Hardin and have talked with Taylor Hardin and representative[s] of Taylor Hardin who are making the representations that Mr. Knox talked with the doctor, indicated that he did not feel that a psychiatric evaluation was needed. At this particular time they are faxing to me records which will be made a part of this particular file and will be part of the record as such. Based on those representations —
 "[Defense counsel]: Your Honor, one more thing before you make your final decision. It is not unusual for insane people to claim they're sane and do not need them and do not need psychiatric evaluation. If he did this, then this is an indication that he is not sane and needs help.
"THE COURT: Okay. Anything else?
"[Defense counsel]: That's it.
"THE COURT: Anything else from the State?
"[Prosecutor]: No, ma'am.
 "THE COURT: Then based on those representations and the notes that will be made a part of the record, then the continuance to allow a further psychiatric evaluation by Taylor Hardin would be denied and the case would be continued for trial. It will go forward for trial. And so you understand, Mr. Knox, that right now it's due to be called next Monday. Do you have any questions?
 "MR. KNOX: How are they gonna sit there and say I denied evaluation? The time wasn't even right. The time they had.
 "THE COURT: Mr. Knox, the decision, that ruling has been made. You need to talk with your attorney. Okay. Thank you."
(R. 3-10.)
On April 12, 2001, the court liaison at Taylor Hardin sent the following letter to the trial judge so that it could become part of the record:
 "Per our conversation, Mr. Knox was scheduled [for] an appointment on 03/15/01 for which the transport officers showed up late. . . . Dr. Jerry Gragg stated that there was not enough time to complete a thorough evaluation but went to speak with the client to see what his current status was.
 "The client explained that he no longer needed services as he was no longer *Page 132 
 suicidal and had patched things up with his wife. I promptly contacted your office, the attorney's office and local officials at the Bibb Correctional Facility. I spoke with the mental health counselor at the correctional facility, who informed me the client had not expressed or exhibited any signs of depression or mental illness. She also stated that the client had not and was not scheduled to receive mental health services while in their facility.
 "Based on this information, Mr. Knox was not rescheduled for evaluation services at this facility."
(C. 48.) (Emphasis added.)
On April 13, 2001, the staff psychologist at Taylor Hardin sent the following letter to the trial judge so that it could become part of the record:
 "Jimmy Paul Knox was scheduled for an outpatient evaluation at Taylor Hardin Secure Medical Facility regarding his competency to stand trial and mental state at the time of the alleged offense of Robbery, First Degree (Case#: CC-2000-215). The evaluation was scheduled for March 15, 2001, at 1:00 p.m. However, Mr. Knox arrived an hour and 15 minutes late for the evaluation accompanied by a Franklin County Deputy. Due to their arriving so late, I was unable to proceed with the evaluation. Nonetheless, because the [D]efense [A]ttorney [I]nformation form, furnished by [defense counsel], indicated recent suicidal ideations on the part of Mr. Knox, I felt that it was important to evaluate his potential for suicide gestures before allowing them to leave the facility. I spoke with Mr. Knox in the presence of the Deputy and asked him specifically if he had [any] inclination to engage in self-injurious behaviors or any intentions to do so and he categorically denied such feelings, and, further, stated that those suicidal ideations abated several months previously. Specifically, I asked him about the information listed in the Defense Attorney Form that stated that his previous despondency was relative to feeling that it was his fault that his marriage failed and despondency about his brother's then-recent demise. He assured me that he and his wife had reconciled and that he was no longer feeling despondent about his brother's demise. Hence, it did not appear to me that Mr. Knox was in need of emergency hospitalization nor experiencing any propensity towards self-injurious behaviors that could not be managed within the corrections setting. This information was related to the Community Court Liaison who passed the information along to jail personnel. Mr. Knox and the accompanying deputy then left the facility to return to the jail."
(C. 62.) (Emphasis added.)
Knox's trial began on April 16, 2001. On April 17, 2001, defense counsel arranged for Knox to be evaluated by Dr. Guy W. Walker, a licensed professional counselor. Dr. Walker "evaluate[d Knox's] mental state [during] the days just prior to the incident in question." (C. 59.) During the trial, on April 18, 2001, the State moved in limine to prohibit Knox from calling Dr. Walker as a witness
 "on the issue of his sanity. Said evidence is highly prejudicial in that the attorney for the defendant may attempt to use this evidence to garner sympathy for her client or to inflame the jurors' passions. . . . In addition, the defendant will suffer no prejudice in the granting of this motion in limine due to the fact that the defendant had an opportunity to be examined by a psychiatrist by way of a court[-]ordered mental examination, but expressly refused this opportunity."
(C. 46-47.)
The trial court conducted a hearing regarding the possibility of Dr. Walker's *Page 133 
testifying at trial. During those proceedings, the trial judge indicated that she had previously determined that Knox was legally sane at the time of the incident. (R. 277, 282.) The trial judge also stated that whether Knox "was suicidal at the time that he went into that store is what this jury has to decide. . . . And so you will not be allowed to give an opinion as to that particular incident that particular date." (R. 284.) The trial judge did not allow Dr. Walker to testify about Knox's sanity at the time of the incident or about anything that would pertain to Knox's intent at the time of the incident. The trial judge then allowed Dr. Walker to testify regarding the few personality tests Dr. Walker had performed on Knox and to answer some hypothetical questions posed by defense counsel.
On cross-examination, the prosecutor questioned Dr. Walker as to how much he had been paid by the defendant and as to how little time he had been able to spend with the defendant, asking, in particular, "Everything you've just testified [to] for the last 48 minutes resulted from one meeting two days ago that lasted 120 minutes where you were compensated by the defendant himself; is that correct?" (R. 311.) Defense counsel objected that the prosecutor was misleading the jury. (R. 312.) The prosecutor questioned Dr. Walker about the fact that he had not been contacted regarding the case until October. (R. 314.) Defense counsel objected, stating that the prosecutor "knows that we already had other tests and other people scheduled. I don't want him to mislead this jury [into thinking] that we did not try to get help for [Knox]." The prosecutor also elicited a negative response from Dr. Walker when he asked, "It's real easy. You can just answer it yes or no. You're not testifying about the defendant's competency or intent to commit the crime today, are you, sir? Yes or no?" (R. 313.)
After jury deliberations had begun, defense counsel argued that
 "the defense ha[d] been severely hampered in this in that [she] would have been pleading this gentleman guilty by reason of insanity at the time the offense occurred if he had been allowed to go to Taylor Hardin as Judge Holly had ordered.
 ". . . And the prosecutor has known it's prosecutorial misconduct for him to stand up and tell this jury and tell the Court and tell everyone that this gentleman did not [seek help] and we did not seek help or reason or way to have him determined mentally incompetent to stand trial and he knew that and that's what that is."
In response, the prosecutor stated:
 "And furthermore, I think the record will reflect that as far as Taylor Hardin, there's documentation in the court file that the defendant declined that psychiatric evaluation; that it was made available to him and when he arrived down there, he declined it. And that's in the record and that's been visited and revisited prior on the record."
(R. 331-32.)
 "It is well settled that a motion for continuance is addressed to the sound discretion of the trial judge, whose exercise of that discretion will not be disturbed on appeal without proof that it was clearly abused. E.g., Arthur v. State, [711 So.2d 1031] (Ala.Crim.App. 1996); Smith v. State, 698 So.2d 189
(Ala.Crim.App. 1996); Long v. State, 611 So.2d 443
(Ala.Crim.App. 1992). Review of a denial of a motion for continuance requires a review of the circumstances of the case, including the reasons the defendant gave to the trial judge in support of the motion, in order to determine whether there was a clear abuse of discretion. Arthur, supra." *Page 134 
R.D. v. State, 706 So.2d 770, 783 (Ala.Crim.App. 1997).
In considering the circumstances of this case, it is clear from the record that the trial judge was concerned by the apparent oversight complained of by Knox; she halted the proceedings to further investigate Knox's situation in order to aid in her reaching a fair and just decision. However, we hold that the trial judge nonetheless abused her discretion when she denied Knox a continuance necessary for him to secure the mental evaluation that had previously been ordered by the circuit court.
The reasons in support of the motion are compelling.
First, the fact that Knox was late for his appointment at Taylor Hardin and could not be evaluated per court order was the fault of the sheriff in whose custody Knox was placed.
Second, the trial judge presiding over the continuance proceedings had already ordered Knox transferred to Taylor Hardin after having seen him at arraignment. Therefore, she, at that point, had already agreed that a mental evaluation was necessary. It appears from the record that the trial judge later refused to continue the trial based on the spectre of a motion for a speedy trial and on the State's assertion that Knox waived further evaluation. However, whether Knox planned to file a motion for a speedy trial was irrelevant to whether he was rightfully due a continuance.[6]
Third, nothing in the record supports the State's assertion and the trial court's finding that Knox waived further evaluation; the letters from Taylor Hardin do not indicate that Knox waived further evaluation regarding his sanity at the time of the offense. Rather, the letters pertain to Knox's potential for suicide just prior to his trial in April 2001, not at the time of the incident. If anything, the record indicates that, if Knox did in fact state that he did not think he needed an evaluation, he was speaking in terms of an evaluation of his suicidal tendencies at the moment when he stood in Taylor Hardin, not in terms of an evaluation of his state of mind at the time of the incident. Therefore, although there is evidence in the record indicating that Knox waived any further evaluation of his competency to stand trial, there is no evidence in the record indicating that Knox waived any further evaluation of his sanity at the time of the commission of the offense.
Fourth, we note that Knox moved to be mentally evaluated within six weeks of his arrest. After the trial court initially granted his request, Knox was taken to Taylor Hardin three months later. After he was returned to jail without having been evaluated, Knox moved for a continuance so that he could undergo a mental evaluation within a month. Therefore, this was not a case with a lengthy procedural history because the series of events leading to Knox's motion for a continuance transpired within approximately six months' time.
Finally, we note that Knox was prejudiced by the denial of his motion for a continuance. The district attorney used the denial of the continuance as fodder for his cross-examination of Dr. Walker. The trial court allowed the district attorney to emphasize the fact that Knox was evaluated at the last minute by a counselor paid *Page 135 
by the defendant. This was clearly an effort to discredit the testimony of Dr. Walker. Furthermore, Dr. Walker's evaluation of Knox was limited because his license allowed him to perform only certain tests on Knox and because his examination of Knox was necessarily last minute. Also, as discussed above, Dr. Walker's testimony was rendered even less substantive by the trial court's constraints.
The record indicates that, at the time of the continuance proceedings, the trial court had already determined that factual data established a reasonable ground to doubt the defendant's sanity, which is the relevant inquiry. See Cliff v. State, 518 So.2d 786, 790 (Ala.Crim.App. 1987).[7]
Thus the evaluation was ordered. Under the facts of this case, the trial court clearly abused its discretion when it denied Knox a continuance in order for the original order to effectuated.
For the reasons stated above, the judgment of the trial court is reversed, and this cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMillan, P.J., and Baschab, Shaw, and Wise, JJ., concur.
[1] During the pendency of these proceedings, the original trial judge retired, a new judge was elected, and she took over the retired judge's docket.
[2] As can best be determined by the record before us, Knox's older brother committed suicide by jumping from a moving automobile being driven by his mother on September 4, 2000. Knox's mother became "morose and depressed." (Appellant's brief, p. 2.) Knox discovered that his girlfriend was pregnant, and he married her on September 23, 2000. On the day of his marriage, Knox's best friend committed suicide. Knox's father died shortly thereafter, and his wife left him. Knox tried to commit suicide by taking 120 over-the-counter stimulants immediately prior to the incident for which he was arrested. His family had tried to have him committed to a psychiatric hospital, but his wife would not sign the commitment papers.
On October 9, 2000, Knox bought a toy dart gun at a Wal-Mart discount store and used the gun to rob a neighborhood store. He maintained that he knew the owner of the store had shot and killed another person who had tried to rob the store. Knox's theory was that his actions were suicidal. The State maintained that that was not the case.
[3] We note that "`d]elays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker[v. Wingo, 407 U.S. 514
(1972)].'" Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App. 1993) (quoting McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App. 1981)).
[4] Knox's priors occurred well over a year before the incident in question.
[5] See supra note 3.
[6] It is axiomatic that "`d]elays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker[v. Wingo,407 U.S. 514 (1972)].'" Zumbado v. State, 615 So.2d 1223, 1234
(Ala.Crim.App. 1993) (quoting McCallum v. State, 407 So.2d 865, 868
(Ala.Crim.App. 1981)).
[7] In Cliff, we stated:
 "A defendant does not have a right to a mental examination whenever he requests one, and, absent such a right, the trial court is the screening agent of such requests. Robinson v. State, 428 So.2d 167
(Ala.Cr.App. 1982); Beauregard v. State, 372 So.2d 37
(Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala. 1979). The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency, and this is a matter within the discretion of the trial court. Miles v. State, 408 So.2d 158 (Ala.Cr.App. 1981), cert. denied, 408 So.2d 163 (Ala. 1982). In determining whether an investigation into the defendant's sanity is required, the trial court must determine if any factual data establish a reasonable ground to doubt the defendant's sanity. Beauregard, 372 So.2d at 43. Where the trial court finds that the evidence presents no reasonable grounds to doubt the defendant's sanity, the standard of appellate review is whether the trial court abused its discretion. Id."
518 So.2d at 790.